John R. Habashy, Esq. (SBN 236708)
*john@lexiconlaw.com*
Tiffany N. Buda, Esq. (SBN 232679)
*tiffany@lexiconlaw.com*
**LEXICON LAW, PC**
633 W. 5th Street, 28th Floor
Los Angeles, CA 90071
Telephone: (213) 223-5900
Facsimile: (888) 373-2107

*[Additional Counsel listed on subsequent page]*

Attorneys for Plaintiff Sharon Tipich and the Putative Class

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

SHARON TIPICH, individually and on behalf all others similarly situated,

                    Plaintiff,

          v.

NATIONSTAR MORTGAGE LLC, d/b/a MR. COOPER; and DOES 1 through 10 inclusive,

                    Defendants.

**CASE NO.: 2:20-cv-03940**

**CLASS ACTION COMPLAINT FOR:**

1.      Violations of Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.* ("RESPA")

2.      Negligence, California Civil Code § 1714

3.      Negligent Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA")

4.      Willful Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA")

**JURY TRIAL DEMANDED**

***Additional Counsel for Plaintiff and the Putative Class:***

Marc E. Dann, Esq. (OH #0039425)
*(Pro Hac Vice Admission Anticipated)*
notices@dannlaw.com
Brian D. Flick, Esq. (OH # 0081605)
*(Pro Hac Vice Admission Anticipated)*
bflick@dannlaw.com
**DANNLAW**
P.O. Box 6031040
Cleveland, OH 44103
Telephone:  (513) 645-3488
Facsimile:   (216) 373-0536

Thomas A. Zimmerman, Jr., Esq. (IL # 6231944)
(*Pro Hac Vice Admission Anticipated*)
tom@attorneyzim.com
**ZIMMERMAN LAW OFFICES, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone:  (312) 440-0020
Facsimile:  (312) 440-4180

Plaintiff SHARON TIPICH, individually and on behalf of all others similarly situated ("Ms. Tipich"), alleges as follows against Defendants NATIONSTAR MORTGAGE LLC, d/b/a MR. COOPER ("Nationstar," "Mr. Cooper" or "Defendant"), and DOES 1 through 10, inclusive:

## I. JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 based on Ms. Tipich's claims under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2614.

2.      This Court, alternatively, has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Counts Ten and Eleven relate to violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

**CLASS ACTION COMPLAINT**

3.    This Court, alternatively, has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds $75,000.00 and the matter is between citizens of different states.

4.    This Court has supplemental jurisdiction to hear and determine Ms. Tipich's state law claims pursuant to 28 U.S.C. § 1367 because those claims are related to Ms. Tipich's federal law claims and arise out of a common nucleus of operative facts.  Ms. Tipich's state law claims are related to Ms. Tipich's federal law claims such that those claims form part of the same case or controversy under Article III of the United States Constitution.

5.    This Court has authority to issue injunctive relief by virtue of Fed. R. Civ. P. 65(a). Furthermore, this Court has authority to issue a declaratory judgment by virtue of 28 U.S.C. § 2201.

6.    Personal jurisdiction over Defendant is proper pursuant to Fed. R. Civ. P. 4(k).   Furthermore, this Court has personal jurisdiction over Defendant as Defendant conducts business within this District and has purposefully availed itself of the laws and markets of the state of California and this District.

7.    Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2) since all incidents, events, and occurrences and omissions giving rise to this action occurred within the Central District of California.  The Western Division is the proper division in that the real property that is the subject of this action is located in Los Angeles County, California.

CLASS ACTION COMPLAINT

## II. PRELIMINARY STATEMENT

8.      This is an action for actual and statutory damages filed by Ms. Tipich, arising out of the improper collection attempts of Mr. Cooper following Ms. Tipich's successful completion of a Chapter 13 bankruptcy.   These improper collection attempts caused Ms. Tipich to pay an improperly inflated reinstatement amount in January 2019 to stop a threatened foreclosure.

9.      Ms. Tipich brings this action for actual and statutory damages due to Defendant's violations of RESPA, 12 U.S.C. § 2601, *et seq.*, which was passed to eliminate abusive practices in the servicing of real estate loans.

10.      Mr. Cooper was additionally negligent in the servicing of Ms. Tipich's loan.   Thus, this is also an action for negligence in the servicing of Ms. Tipich's mortgage loan.

11.      In addition to the acts described above, Mr. Cooper committed multiple negligent and willful violations of the TCPA, 47 U.S.C. § 227, *et seq.*

## III. THE PARTIES

12.      Plaintiff Sharon Tipich is, and was at all times mentioned herein, over the age of 18 and a resident of Los Angeles County, California.   Ms. Tipich is domiciled in and is a citizen of California.  Ms. Tipich's home is located in San Pedro, within the City of Los Angeles, California (the "Property") and is, at all relevant times, owner-occupied. The Property is Ms. Tipich's principal and family residence. The mortgage loan that is secured by Ms. Tipich's Property (the "mortgage loan") is

a first-lien, federally related mortgage loan that is secured by residential property, upon which there is a structure for occupancy of from one to four families for which the loan was made by any lender that is regulated by an agency of the Federal Government or is made by a creditor that makes or invests in residential real estate loans aggregating more than $1,000,000.00 per year.

13.    Defendant Nationstar Mortgage LLC, d/b/a Mr. Cooper is a Delaware limited liability company. Defendant is an indirect, wholly-owned subsidiary of a publicly-traded company, Mr. Cooper Group, Inc. (formerly known as WMIH Corp.), a Delaware corporation with its principal place of business located at 8950 Cypress Waters Blvd., Coppell, Texas. Defendant is directly owned by two entities: (1) Nationstar Sub1 LLC ("Sub1") and (2) Nationstar Sub2 LLC ("Sub2"). Both Sub1 and Sub2 are Delaware limited liability companies. Sub 1 and Sub2 are both 100% owned by Nationstar Mortgage Holdings, Inc. ("NSM Holdings"), a Delaware corporation with its principal place of business located at 8950 Cypress Waters Blvd., Coppell, Texas. NSM Holdings is a wholly-owned subsidiary of Mr. Cooper Group, Inc. Defendant is the holder, assignee and/or servicer of the mortgage loan on Ms. Tipich's Property. At all times material to this action, Defendant regularly transacted and conducted significant business in the State of California.

14.    The true names and capacities of DOES 1 through 10 are currently unknown to Ms. Tipich who alleges that DOES 1 through 10 are responsible in some manner for the injuries sustained by Ms. Tipich as hereinafter alleged. Ms. Tipich

requests leave to file amendments to this complaint alleging the true names and capacities of DOES 1 through 10 when the same have been ascertained. Ms. Tipich is informed and believes, and on that basis alleges, that at all times herein mentioned, each of the Defendants was an agent, servant, employee, and/or joint venture of each of the remaining Defendants, and was at all times acting within the course and scope of such agency, service, employment, and/or joint venture, and each Defendant has ratified, approved, and authorized the acts of each of the remaining Defendants with full knowledge of said facts.

15.     Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Ms. Tipich, as alleged herein. In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its/his/her primary wrongdoing and realized that its/his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

16.     There is a unity of interest between Defendants, and each acts as the alter ego of the other.

17.     The Defendants identified above shall hereinafter be collectively referred to as "Defendants."

### IV. STANDING

**CLASS ACTION COMPLAINT**

18.    Standing is proper under Article III of the Constitution of the United States of America because Ms. Tipich's claims state:

a.    A valid injury in fact;

b.    Which is traceable to the conduct of Defendants;

c.    And is likely to be redressed by a favorable judicial decision.

*See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

19.    In order to meet the standard laid out in *Spokeo*, Ms. Tipich must clearly allege facts demonstrating all three prongs above.

**A.    The "Injury in Fact" Prong**

20.    Ms. Tipich's injury in fact must be both "concrete" and "particularized" in order to satisfy the requirements of Article III of the Constitution, as laid out in *Spokeo*. *See id.* at 1548.

21.    For an injury to be "concrete" it must be a *de facto* injury, meaning that it actually exists.  In the present case, an erroneous and wrongful foreclosure was initiated by Defendants against Ms. Tipich's Property.  Further, Defendants failed to respond to Requests for Information and Notices of Error brought pursuant to RESPA.  Such an erroneous and wrongful foreclosure, and the failures of Defendants to provide information and to correct servicing errors were and continue to be extremely emotionally distressing and stressful, and defending against Defendants' wrongful actions has and continues to impose significant expenses on Ms. Tipich. In

**CLASS ACTION COMPLAINT**

addition, Ms. Tipich received numerous unsolicited and harassing text messages in violation of the TCPA.

22.    All these injuries are concrete and *de facto*. For an injury to be "particularized" means that the injury must "affect the Plaintiff in a personal and individual way." *Id*. Ms. Tipich's home and peace of mind were threatened by Defendants' erroneous and wrongful foreclosure, subsequent failure to correct ongoing servicing errors and by the unsolicited harassing text messages. All these injuries are particularized and specific to Ms. Tipich.

### B.    The "Traceable to the Conduct of Defendant" Prong

23.    The second prong required to establish standing at the pleadings phase is that Ms. Tipich must allege facts to show that Ms. Tipich's injury is traceable to the conduct of Defendants.

24.    In the instant case, this prong is met simply by the fact that a wrongful foreclosure had been initiated by Defendants directly, or by their agents at their direction and control; and further, by the fact that the failure to correct ongoing servicing errors and provide information relating to Ms. Tipich's mortgage loan was directly due to Defendants' actions, or by their agents at Defendants' direction and control.

### C.    The "Injury is Likely to be Redressed by a Favorable Judicial Opinion" Prong

**CLASS ACTION COMPLAINT**

25.     The third prong to establish standing at the pleadings phase requires Ms. Tipich to allege facts to show that the injury is likely to be redressed by a favorable judicial opinion.

26.     In the present case, Ms. Tipich's Prayers for Relief include a request for damages for each violation of RESPA, as authorized by statute in 12 U.S.C. § 2605(f), and as authorized by statute for the violations of the TCPA.  These statutory damages were set by Congress and specifically redress the financial damages suffered by Ms. Tipich due to Defendants' unlawful conduct.

27.     Ms. Tipich's Prayers for Relief also include a request for actual damages that Ms. Tipich has suffered due to the unlawful and wrongful conduct of Defendants, and specifically redress the emotional distress, physical distress, and expenses and costs Ms. Tipich has suffered as a direct result of Defendants' erroneous and unlawful foreclosure action, harassing and unsolicited text messages, subsequent failure to correct ongoing servicing errors and failure to provide information regarding Ms. Tipich's mortgage loan.

28.     The award of monetary damages redresses the injuries of the past, the present, and prevent further injury in the future.

29.     Because all standing requirements of Article III of the U.S. Constitution have been met, Ms. Tipich has standing to sue Defendants.

## V. SUMMARY OF CLAIMS - RESPA

30.    In January 2013, the Consumer Financial Protection Bureau ("CFPB") issued a number of final rules concerning mortgage markets in the United States, pursuant to the Dodd-Frank Act, Public Law No. 111-203, 124 Stat. 1376 (2010).

31.    Specifically, on January 17, 2013, the CFPB issued the RESPA (Regulation X) Mortgage Servicing Final Rules, 78 Fed. Reg. 10695 (February 14, 2013), and the Truth in Lending Act ("TILA") (Regulation Z) Mortgage Servicing Final Rules, 78 Fed. Reg. 10901 (February 14, 2013), which became effective on January 10, 2014.

32.    The CFPB published a preamble to the rules where it provided an overview of the mortgage servicing market and the market failures the new rules were intended to address. *See*, 2012 RESPA Servicing Proposal, 77 Fed. Reg. 57200 (Sept. 17, 2012).[1]

33.    Section 1463(a) of the Dodd-Frank Act adds section 6(k)(1)(E) to RESPA, which provides that a servicer of a federally related mortgage loan must "comply with any other obligation found by the [Bureau], by regulation, to be appropriate to carry out the consumer protection purposes of this Act."   This provision provides the Bureau authority to establish prohibitions on servicers of federally related mortgage loans appropriate to carry out the consumer protection purposes of RESPA. As discussed below, in light of the systemic problems in the

[1]Relevant portions are included here, but the entire preamble is available at: http://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-tila-preamble.pdf

mortgage servicing industry discussed above, the Bureau is exercising this authority in rulemaking to implement protections for borrowers with respect to mortgage servicing. *Id.* at 26.

34.     Mortgage servicing is performed by banks, thrifts, credit unions, and non-banks under a variety of business models. In some cases, creditors service mortgage loans that they originate or purchase and hold in portfolio. Other creditors sell the ownership of the underlying mortgage loan, but retain the mortgage servicing rights in order to retain the relationship with the borrower, as well as the servicing fee and other ancillary income. In other cases, servicers have no role at all in origination or loan ownership, but rather purchase mortgage servicing rights on securitized loans or are hired to service a portfolio lender's loans. *Id.* at 14.

35.     These different servicing structures can create difficulties for borrowers if a servicer makes mistakes, fails to invest sufficient resources in its servicing operations, or avoids opportunities to work with borrowers for the mutual benefit of both borrowers and owners or assignees of mortgage loans. Although the mortgage servicing industry has numerous participants, the industry is highly concentrated, with the five largest servicers servicing approximately 53% of outstanding mortgage loans in this country. *Id.* at 14.

36.     Compensation structures vary somewhat for loans held in portfolio and securitized loans, but have tended to make pure mortgage servicing (where the servicer has no role in origination) a high-volume, low-margin business. *Id.* at 15.

The primary exception being loans deemed by servicers to be in default. Servicing of defaulted loans provides servicers with substantially greater fee income.

37.    Under this business model, servicers act primarily as payment collectors and processors, and will have limited incentives to provide other customer service. Servicers are generally not subject to market discipline from consumers because consumers have little opportunity to switch servicers. Rather, servicers compete to obtain business from the owners of loans—investors, assignees, and creditors—and thus competitive pressures tend to drive servicers to lower the price of servicing and scale their investment in providing service to consumers accordingly. *Id.* at 16.

38.    These attributes of the servicing market created problems for certain borrowers even prior to the financial crisis. For example, borrowers experienced problems with mortgage servicers during regional mortgage market downturns that preceded the financial crisis.  There is evidence that borrowers were subjected to improper fees that servicers had no reasonable basis to impose, improper force-placed insurance practices, and improper foreclosure and bankruptcy practices. *Id.* at 17.

39.    The Government Accountability Office ("GAO") has found pervasive problems in broad segments of the mortgage servicing industry impacting delinquent borrowers, such as servicers who have misled, or failed to communicate with, borrowers, lost or mishandled borrower-provided documents supporting loan modification requests, and generally provided inadequate service to delinquent

borrowers. It has been recognized in Inspector General reports, and the Bureau has learned from outreach with mortgage investors, that servicers may be acting to maximize their self-interests in the handling of delinquent borrowers, rather than the interests of owners or assignees of mortgage loans. *Id.* at 19.

40.    Ms. Tipich's mortgage loan that was serviced by Mr. Cooper was secured by residential property (the "mortgage loan") and is a "federally related mortgage loan" as defined by 12 C.F.R. § 1024.2(b).

41.    Thus, Defendants are subject to Regulations X and Z and do not qualify for an exception for "small servicers," as defined in 12 C.F.R. § 1026.41(e)(4), nor any exemption for a "qualified lender", as defined in 12 C.F.R. § 617.700.

42.    Ms. Tipich asserts claims for relief against Defendants for violations of the specific rules set forth in Regulations X and Z, as set forth *infra*.

43.    Ms. Tipich asserts a private right of action under RESPA, pursuant to 12 U.S.C. § 2605(f), and any such action provides for remedies including actual damages, costs, statutory damages, and attorneys' fees.

## VI. SUMMARY OF CLAIMS - TCPA

44.    <u>Robocalls Outlawed</u>: Enacted in 1991, the TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system ["ATDS"] or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1). Encouraging individuals

to hold robocallers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(b)(3).

45.   Rationale: In enacting the TCPA, Congress found: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10). Congress continued: "Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* § 2(12).

46.   The TCPA's sponsor described unwanted robocalls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall." 137 Cong. Rec. 30,821 (1991) (statement of Sen. Hollings).

47.   Text Messages: For TCPA purposes, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009).

**CLASS ACTION COMPLAINT**

48.    <u>Do Not Call Registry</u>: Additionally, the TCPA outlaws unsolicited telemarketing (robocalls or otherwise) to phone numbers on the National Do Not Call Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2). Encouraging individuals to hold telemarketers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(c)(5).

49.    <u>Broadly Construed</u>: As a remedial statute that was passed to protect consumers from unwanted automated telephone calls, the TCPA is construed broadly to benefit consumers. *See Marks v. Crunch San Diego, LLC,* 904 F.3d 1041 (9th Cir. 2018).

50.    Unfortunately, the problems Congress identified when it enacted the TCPA have grown only worse in recent years.

51.    "Month after month, unwanted [communications], both telemarketing and informational, top the list of consumer complaints received by the [Federal Communications] Commission." *In re Rules and Regulations Implementing the TCPA of 1991*, 30 F.C.C. Rcd. 7961, 7991 ¶ 1 (2015).

52.    "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC."[2]

---

[2]Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC Chairman).

**CLASS ACTION COMPLAINT**

53.    "The FTC receives more complaints about unwanted calls than all other complaints combined."[3]

54.    In 2017, the FTC received 4,501,967 complaints about robocalls, compared with 3,401,614 in 2016. For every month in the fiscal year, robocalls made up the majority of consumer complaints about Do Not Call violations.[4]

55.    The New York Times reported extensively on the surging number of robocall complaints filed by consumers with the FTC and widespread consumer outrage about illegal telemarketing.[5]

56.    The TCPA was designed to prevent calls and messages like the ones described within this Complaint, and to protect the privacy of citizens like Plaintiffs. "Voluminous consumer complaints about abuses of telephone technology—for example, computerized calls dispatched to private homes—prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

## VII. PATTERN AND PRACTICE OF RESPA VIOLATIONS BY MR. COOPER

---

[3]Comment of the Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the TCPA of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at p. 2; FCC 16-57 (June 6, 2016), available at https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureauconsumer-protection-federal-communications-commission-rulesregulations/160616robocallscomment.pdf.

[4]Federal Trade Commission, *FTC Releases FY 2017 National Do Not Call Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-national-do-notcall-registry-data-book-dnc.

[5]Tara Siegel Bernard, Yes, It's Bad. Robocalls, and Their Scams, Are Surging, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-riseillegal.html.

**CLASS ACTION COMPLAINT**

57.    It is clear that Mr. Cooper has engaged in a pattern and practice of mistreating mortgage loan borrowers and violating provisions of RESPA and the regulations promulgated thereunder at Regulation X.  This pattern and practice is evidenced in this case by at least six distinct violations, as alleged herein.

58.    At the time of the filing of this Complaint, Mr. Cooper has had at least 67,979 consumer complaints lodged against it nationally. Specifically concerning the issues identified on the CFPB's consumer complaint database, at least 20,760 such complaints were identified as "mortgage," at least 7,430 such complaints were identified as "loan servicing, payments, escrow account," and at least 2,445 such complaints were identified as "trouble during payment process."[6]

## VIII. FACTUAL ALLEGATIONS

**A.    Ms. Tipich's Experience with Mr. Cooper**

**(2013–May 2018: The Chapter 13 Bankruptcy)**

59.    Ms. Tipich's experience includes many of the mortgage servicing failures identified in the CFPB preamble.

60.    Ms. Tipich is an artist who purchased the Property, a residential home located in San Pedro, California, on or about March 28, 2001, for approximately

---

[6]Each such complaint is filed and cataloged in the CFPB's publicly accessible online database, which is located at (Nationstar Mortgage): https://www.consumerfinance.gov /data-research/consumer-complaints/search/?from=0&searchField=all&searchText =nationstar&size=25&sort=created_date_desc.
And located at (Mr. Cooper): https://www.consumerfinance.gov/data-research/consumer-complaints/search/?from=0&searchField=all&searchText=mr.%20cooper&size=25&sort=created _date_desc.

**CLASS ACTION COMPLAINT**

$399,000.00. Mr. Cooper began servicing Ms. Tipich's mortgage loan on or about December 16, 2013.

61.     Ms. Tipich struggled financially, and around January 14, 2013, Ms. Tipich filed for Chapter 13 bankruptcy to reorganize her debts in the Central District of California, Case No. 2:13-bk-11040-VZ [Docket 1]. A copy of the Docket of Ms. Tipich's Bankruptcy Case is attached as *Exhibit 1* to this Complaint.

62.     On or about February 13, 2014, the bankruptcy court confirmed Ms. Tipich's Chapter 13 bankruptcy plan [Docket 48]. *See Exhibit 1*.

63.     While in bankruptcy, Ms. Tipich obtained a loan modification on her mortgage loan, and the bankruptcy court issued an order granting and authorizing Ms. Tipich to enter into the loan modification agreement on or about August 29, 2013 [Docket 30]. *Id.*; *see also Exhibit 2* attached hereto - a copy of the underlying Notice and Motion to Enter Into Post-Petition Modification Agreement.

64.     Per the terms of the loan modification, Ms. Tipich was deemed contractually current, as all past due interest, services expenses, taxes and insurance, totaling $28,574.63, was added to the principal balance, and the new loan balance became $364,742.12. *See Exhibit 2* at p. 9 (ECF pagination).

65.     Even though Ms. Tipich had obtained a loan modification per the above terms, on or about October 25, 2013, the Bank of New York Mellon filed a claim alleging that Ms. Tipich was in default in the amount of $38,435.64 for past due interest, late charges, and other charges [Docket 38]. *Exhibit 1* at p. 4.

66.     On or about March 4, 2014, the bankruptcy court issued an order [Docket 52] to disallow the claim of the Bank of New York Mellon because:

> Debtor and Creditor have entered a post-petition Loan Modification agreement which brought the loan contractually current.   There are no arrears to be paid through the Chapter 13 plan.   The new loan balance is $364,742.12.  All past due interest, servicing expenses, and taxes and insurance have been added to this amount.
>
> *See* Order, ***Exhibit 3.***

67.     In 2016, Ms. Tipich fell four payments behind in her mortgage loan payments and had a post-petition default balance of $6,766.64 (which included the four missed payments, attorney's fees and costs).  On or about January 13, 2017, Nationstar (Mr. Cooper) and Ms. Tipich executed a stipulation in the bankruptcy court establishing a repayment plan for the delinquency [Docket 72]. *See* Stipulation, ***Exhibit 4*** at p. 5 (ECF pagination).

68.     Ms. Tipich paid according to the repayment plan from January 13, 2017 until her final payment on September 15, 2017. As of September 15, 2017, Ms. Tipich was current on her mortgage loan and owed no arrears and had no delinquency.

69.     Ms. Tipich continued to make her mortgage loan and trustee payments in accordance with her bankruptcy plan.  On or about May 16, 2018, Ms. Tipich

CLASS ACTION COMPLAINT

obtained a discharge in her bankruptcy matter, and her bankruptcy was terminated on or about June 19, 2018 [Docket Nos. 84 and 85]. ***Exhibit 1*** at p. 9.

### (May 2018–September 2018: Post-Chapter 13 Discharge)

70.    As of the date of her discharge, Ms. Tipich was current with her mortgage loan payments. On or about July 17, 2018, Ms. Tipich paid her July 2018 mortgage loan payment to Mr. Cooper, which Mr. Cooper accepted.

71.    Even though Ms. Tipich had been paying her mortgage loan payments to Mr. Cooper and was completely current, immediately after receiving her discharge, starting in July 2018, Mr. Cooper started sending Ms. Tipich communications that erroneously asserted that her mortgage loan account was not current.

72.    July 20, 2018 was the first contact Ms. Tipich had with Mr. Cooper regarding Mr. Cooper's erroneous position that Ms. Tipich's mortgage loan account was not current.    Mr. Cooper sent Ms. Tipich an unsolicited text message to her cellular phone that stated:

> Mr. Cooper Loans.   Account Alert. Please call us at 8663162432. *We are a debt collector*. To Opt Out reply, "stop."

*See **Exhibit 5***.   Prior to receiving this text message, Ms. Tipich received no letters, notices or other form of communication from Mr. Cooper informing her that there was an issue with her mortgage loan account.

73.   In her mortgage loan statement dated July 18, 2018, Mr. Cooper erroneously stated that Ms. Tipich owed $10,511.14.  Mr. Cooper also assessed $1,046.75 in legal fees and $526.39 in "maintenance" fees.  Ms. Tipich could not understand the reason for Mr. Cooper stating that she owed $10,511.14, as she was completely current in her payments.

74.   This was the first communication from Mr. Cooper that provided any sort of detail regarding Mr. Cooper's erroneous calculation of the alleged default status of Ms. Tipich's mortgage loan account.  Ms. Tipich paid her August payment on or about July 30, 2018, which Mr. Cooper accepted.

75.   On August 3, 2018, August 14, 2018 and August 25, 2018, Mr. Cooper sent Ms. Tipich more unsolicited text messages to her cellular phone that stated:

Mr. Cooper Loans. Account Alert. Please call us at 8663162432. *We are a debt collector*. To Opt Out reply, "stop."

See *Exhibits* **5 and 6**. Besides the July 2018 mortgage loan statement, Ms. Tipich received no other form of communication from Mr. Cooper informing her of the status of her mortgage loan account, nor any other notices or letters that explained Mr. Cooper's reason for an "alert" to be placed on her account.

76.   After the August 25, 2018 unsolicited texts from Mr. Cooper, Ms. Tipich received a letter dated August 20, 2018 that erroneously stated:

As of 08/20/2018, you are 142 days delinquent on your mortgage loan. Here is a recent payment history, and the reason for our concern:

**RECENT ACCOUNT HISTORY**

PAYMENT DUE 03/01/2018 Fully paid on 07/30/2018

PAYMENT DUE 04/01/2018 Unpaid balance of $1,723.29

PAYMENT DUE 05/01/2018 Unpaid balance of $1,723.29

PAYMENT DUE 06/01/2018 Unpaid balance of $1,723.29

PAYMENT DUE 07/01/2018 Unpaid balance of $1,894.69

PAYMENT DUE 08/01/2018 Unpaid balance of $1,894.69

. . .

**AS OF 08/20/2018 THE TOTAL AMOUNT DUE IS $9,321.12**. *You must pay this amount to bring your loan current.*

See *Exhibit 7*. However, Ms. Tipich paid, and Mr. Cooper accepted *all* the payments that Mr. Cooper was erroneously alleging as "unpaid" as supported by Ms. Tipich's bank account statements. *See Chase Bank Account Statements* attached as *Exhibit 8*.

77.    In her August 20, 2018 mortgage loan statement, Mr. Cooper erroneously assessed that the amount due was $9,321.12.    Mr. Cooper also erroneously assessed a $61.55 late charge, and a $15.00 property inspection fee. On

or about August 29, 2018, Ms. Tipich paid her September 2019 payment, which Mr. Cooper accepted.

78.     In her September 18, 2018 mortgage loan statement, Mr. Cooper continued to erroneously assess Ms. Tipich's account as past due and stated that the amount due was $9,382.99.   Mr. Cooper also erroneously assessed a $61.55 late charge, and a $15.00 property inspection fee.   On or about October 4, 2018, Ms. Tipich made her October 2018 payment to Mr. Cooper.   Ms. Tipich made her payment for the correct full amount due ($1,823.61) and on time.

**(October 2018–January 2019: The Foreclosure)**

79.     This was immensely distressing to Ms. Tipich, as Ms. Tipich was not behind on her payments.   Ms. Tipich telephoned Mr. Cooper, and a representative told Ms. Tipich that if the total amount Mr. Cooper was alleging as past due was not paid by October 4, 2018, they had no obligation to speak with her.

80.     In October 2018, Ms. Tipich received a letter from Mr. Cooper dated October 10, 2018, returning Ms. Tipich's October 2018 payment, erroneously stating: "We are returning these funds as they are insufficient to bring your account current.  As of the date of this letter, the total amount required to bring this account current is $9,427.99." Soon thereafter, Ms. Tipich received a "Debt Validation Notice" dated October 12, 2018.

81.     On or about November 2, 2018, without any documentation supporting a foreclosure action, Mr. Cooper recorded a Notice of Default against Ms. Tipich's

home that erroneously stated that Ms. Tipich had past due payments totaling $10,380.49 as of October 31, 2018. A copy of the Notice of Default is attached as *Exhibit 9.*

82.     Ms. Tipich was completely confused about what to do and started to severely suffer emotionally from the immense distress of facing the possible loss of her home. Her home meant everything to her. Ms. Tipich started to grind her teeth and lose focus at work. After the phone call with Mr. Cooper, Ms. Tipich did not know how to remedy the situation. She was current on her mortgage loan, and yet Mr. Cooper was erroneously stating that she had not been making payments, was not accepting her payments, and was now foreclosing on her home.

83.     Ms. Tipich again attempted to make her monthly payment. On or about November 3, 2018, Ms. Tipich sent Mr. Cooper the correct payment amount of $1,894.69. Shortly thereafter, Ms. Tipich received a letter from Mr. Cooper dated November 14, 2018, that again erroneously stated: "We are returning these funds as they are insufficient to bring your account current. As of the date of this letter, the total amount required to bring this account current is $12,531.10." This amount included unreasonable legal fees, property inspection fees, maintenance fees, lender paid expenses, "other" fees and late charges assessed from July to November 2018, totaling at least $3,164.73.

84.     In her mortgage loan statement dated November 20, 2018, Mr. Cooper erroneously stated that Ms. Tipich was $11,083.50 past due, and that the

reinstatement amount due was $14,449.70. The statement included $1,189.50 in erroneously assessed legal fees, and a $15.00 property inspection fee.

85.    Ms. Tipich sent Mr. Cooper her December payment for $1,894.60 on or about December 8, 2018. Ms. Tipich received a letter from Mr. Cooper dated December 22, 2018 returning her payment and stating that: "We recently received a payment on your behalf in the amount of $1,894.69. We are returning these funds as they are insufficient to bring your account current.  As of the date of this letter, the total amount required to bring this account current is $14,734.70."

86.    Soon thereafter, Ms. Tipich received her mortgage loan statement dated December 18, 2018, in which Mr. Cooper erroneously stated that the reinstatement amount due was $16,558.31. The statement included erroneously charged fees for $60.00 in property inspection fees, and $1,644.49 in legal fees.  The statement also stated: "**Your loan has been accelerated**." Ms. Tipich also received a letter also dated December 18, 2018 that erroneously stated (*see Exhibit 10*):

> As of 12/18/2018, you are 201 days delinquent on your mortgage loan. We have completed the first filing notice required to start the foreclosure process on your account. Here is a recent payment history, and the reason for our concern:
>
> RECENT ACCOUNT HISTORY
>
> PAYMENT DUE 07/01/2018 Unpaid balance of $1,894.69

**CLASS ACTION COMPLAINT**

PAYMENT DUE 08/01/2018 Unpaid balance of $1,894.69

PAYMENT DUE 09/01/2018 Unpaid balance of $1,823.61

PAYMENT DUE 10/01/2018 Unpaid balance of $1,823.61

PAYMENT DUE 11/01/2018 Unpaid balance of $1,823.61

PAYMENT DUE 12/01/2018 Unpaid balance of $1,823.61

CURRENT PAYMENT DUE 01/01/2019: $1,823.61

As of 12/18/2018 THE TOTAL AMOUNT DUE IS $16,558.31. *You must pay this amount to bring your loan current.*

87.     On or about January 7, 2019, Ms. Tipich obtained her credit reports from TransUnion and Experian.  Ms. Tipich then discovered that Mr. Cooper also furnished erroneous negative credit information to the credit reporting agencies that Ms. Tipich was not paying her mortgage loan, when in fact, she had been.  On her Experian Report, Mr. Cooper reported that Ms. Tipich was 120 days past due in July 2018, 90 days past due in August 2018, and 120 days past due in September 2018; Mr. Cooper also reported that Ms. Tipich was $7,436.00 past due as of September 2018.

88.     On her TransUnion Report, Mr. Cooper reported that Ms. Tipich was 120 days past due in July 2018, 90 days past due in August 2018, and 120 days past due in September 2018; Mr. Cooper also reported that Ms. Tipich had a maximum

delinquency of 120 days in July 2018 and in September 2018 for $7.436.00, and that the last payment received on August 29, 2018 was for $0.00.

89.     After receiving the Notice of Default in November 2018, Ms. Tipich was in fear that she was going to lose her beloved home, and did not know who to turn to for assistance.  Mr. Cooper was refusing to speak with her and was now pursuing foreclosure.  Ms. Tipich retained legal counsel to assist her with having Mr. Cooper correct the errors they were making in servicing her loan.

90.     Ms. Tipich, through her counsel, sent a Notice of Error letter ("NOE #1") on or about December 17, 2018.  NOE #1 requested that Mr. Cooper halt the foreclosure proceedings until the servicing errors were reviewed and corrected.

91.     However, Mr. Cooper did not halt the foreclosure proceedings while reviewing the errors addressed in NOE #1.  Even after receiving NOE #1, Mr. Cooper continued to proceed with the foreclosure.  Ms. Tipich was now faced with an imminent decision: pay the erroneous amount Mr. Cooper wrongfully demanded or lose her home.  Around January 18, 2019, Ms. Tipich paid approximately $17,047.31 to "reinstate" her loan.

92.     Shortly before paying to reinstate her home, Ms. Tipich went to her dentist on January 11, 2019, complaining of jaw pain.  Ms. Tipich was diagnosed with temporomandibular joint dysfunction, or TMJ syndrome. Ms. Tipich continued to see her dentist on January 14, 2019, February 20, 2019, February 28, 2019, March 11, 2019, March 28, 2019 and April 3, 2019 for additional visits related to her TMJ

syndrome including treatment. In diagnosing her TMJ syndrome, the dentist noted the condition was stress related.

**B**.     **Notice of Error #1**

93.     As set forth above, on December 17, 2018, Ms. Tipich, through her counsel, sent NOE #1 to Mr. Cooper, pursuant to 12 C.F.R. § 1024.35, by certified mail to the address designated by Mr. Cooper on its website for the receipt of Notice of Error letters, that address being: P.O. Box 619098, Dallas, Texas 75261-9741. *See* NOE #1, attached hereto as ***Exhibit 11.***

94.     NOE #1 related to the servicing of Ms. Tipich's mortgage loan and the servicing errors Mr. Cooper had committed.

95.     NOE #1 was delivered to Mr. Cooper on or about December 22, 2018.

96.     In a letter dated December 26, 2018, Mr. Cooper acknowledged it had received NOE #1, and that a response would be provided by January 23, 2019.

97.     Ms. Tipich received a response to NOE #1 in a letter dated February 1, 2019. *See **Exhibit 12*** - February 1, 2019 cover letter of full response.

98.     Mr. Cooper's response to NOE #1 admitted that serious errors had been committed in the servicing of Ms. Tipich's mortgage loan, as follows:

> We show that Mr. Cooper began servicing this account
>
> effective December 16, 2013. Reviewing the account, we
>
> show that your client completed a Loan Modification with
>
> Bank of America prior to the transfer and the motion to

allow the Loan Modification was approved on August 29, 2013, in the bankruptcy court. Therefore, an amended chapter 13 plan was filed on October 15, 2013, and confirmed on February 13, 2014, by the United States Bankruptcy Court. The amended plan did not include any arrears for Bank of America or Mr. Cooper.

On December 7, 2016, we filed a Motion for Relief from the Automatic Stay (Motion for Relief) stating your client was past due for the three post-petition payments as well as the outstanding December 1, 2016 post-petition payment. In response to the motion, an Adequate Protection agreement was entered on January 13, 2017, stating that your client would make regular monthly payments in the amount of $1,723.29 commencing January 1, 2017, and ongoing in accordance with the loan modification completed with Bank of America, and the debtor must cure the post-petition default consisting of four regular payments for September 1, 2016 through December 1, 2016, along with attorney fees of $1,031.00 less suspense balance with monthly installments of

$751.85 commencing on January 15, 2017, through September 15, 2017. We confirmed that your client made all of these payments. Our records reflect that your client was discharged from bankruptcy on May 16, 2018. Keep in mind while an account is in active bankruptcy status, all payments are put in a miscellaneous account and then applied to the account in accordance with the bankruptcy plan by bankruptcy department. As such, we applied the payments to the account and closed the bankruptcy in our system on July 19, 2018. We show that after the bankruptcy was closed in our system the account was delinquent and due for the March 1, 2018 monthly payment.

After further review, we confirmed that the reason the account reflected delinquent when the bankruptcy was discharged was because the account was post-petition due for May 1, 2016, not September 1, 2016, when the Motion for Relief was filed. Due to there was a loan modification, there were no pre-petition payments due. We show an error occurred with the payment ledger at the time of the Motion for Relief due to we did not claim the four additional

**CLASS ACTION COMPLAINT**

payments. As a correction to this error, we have put in a

request to advance four monthly payments effective March

1, 2018 through June 1, 2018, on the account. If your client

would like a refund for the payment made in reinstating the

account, you may contact me directly at the information

below.

Due to the above error, the account was incorrectly referred

to foreclosure on October 9, 2018, as the account was due

for June 1, 2018 monthly payment. While the account was

in foreclosure, we were not able to accept any payment less

than a full reinstatement of the loan including any legal

fees associated with the account. We show that the account

was reinstated by your client on January 18, 2019, and the

account is currently due for February 1, 2019 monthly

payment of $1,823.61, and all foreclosure proceedings

were closed. As the account is current, we are unable to

provide a reinstatement amount. Once the funds are

advanced and reapplied to the account correctly we will

cover the fees your client received associated with the

delinquency and the foreclosure. In addition, once the

**CLASS ACTION COMPLAINT**

funds have been applied, we will submit a credit update to the credit reporting agencies to remove any negative credit reporting that may have taken place since the bankruptcy status was removed from the account.

See **Exhibit 12** at pp. 1–2.

99.    To correct its errors, Mr. Cooper stated that it would: (1) advance four monthly payments to the account; (2) refund the payment made to reinstate the account; (3) refund all fees Ms. Tipich was erroneously assessed; and (4) submit a credit update to the credit reporting agencies to remove the negative credit reporting Mr. Cooper erroneously furnished to consumer reporting agencies.  See **Exhibit 12** at pp. 1–2.

100.    The letter failed to provide written notification of the correction and the effective date of the correction.

101.    Per the letter, counsel for Ms. Tipich contacted the point of contact on the letter, Amy Washington, via telephone, and informed Ms. Washington that Ms. Tipich would like a refund for the reinstatement payment, including a refund of the erroneously assessed fees and charges.

102.    By March 2019, Mr. Cooper still had not calculated the amount to refund to Ms. Tipich.  Unable to make any progress in having Mr. Cooper correct its errors, Ms. Tipich, through her counsel, sent Mr. Cooper a Notice of Error ("NOE #2") on or about March 26, 2019.

**CLASS ACTION COMPLAINT**

C.    **Request for Information #1**

103.    On December 17, 2018, Ms. Tipich, through her counsel, sent to Mr. Cooper a Request for Information ("RFI #1"), pursuant to 12 C.F.R. § 1024.36, by certified mail to the address designated by Mr. Cooper on its website for the receipt of Request for Information letters, that address being: P.O. Box 10335, Des Moines, IA 50306-0335.  A copy of RFI #1 is attached as *Exhibit 13.*

104.    RFI #1 requested information related to the servicing of Ms. Tipich's mortgage loan.

105.    RFI #1 was delivered to Mr. Cooper on or about December 24, 2018.

106.    In a letter dated December 26, 2018, Mr. Cooper acknowledged it had received RFI #1.

107.    In the same letter, Mr. Cooper stated that a response will be provided to RFI #1 by January 23, 2018 [sic].

108.    To this date, neither Ms. Tipich, nor her counsel, has received a response to RFI #1.

D.    **Notice of Error #2**

109.    On March 26, 2019, Ms. Tipich, through her counsel, sent to Mr. Cooper NOE #2, pursuant to 12 C.F.R. § 1024.35, by certified mail to the address designated by Mr. Cooper on its website for the receipt of Notice of Error letters, that address

**CLASS ACTION COMPLAINT**

being: P.O. Box 10335, Des Moines, IA 50306-0335.  A copy of NOE #2 is attached as ***Exhibit 14***.

110.    NOE #2 related to the servicing of Ms. Tipich's mortgage loan and Mr. Cooper's failure to complete the corrections noted in NOE #1.

111.    NOE #2 was delivered to Mr. Cooper on or about March 30, 2019.

112.    In a letter dated April 11, 2019, Mr. Cooper stated it received NOE #2 on April 9, 2019, and would provide a response by May 20, 2019.

113.    Despite its pledge to respond by May 20, 2019, Mr. Cooper did not respond to NOE #2 until June 11, 2019. A copy of this response is attached as ***Exhibit 15***.

114.    In its response to NOE #2, Mr. Cooper states among other things that:

> We show an error occurred with the payment ledger at the time of the Motion for Relief, as we did not claim the four additional payments.  As a correction to this error, we have put in a request to advance four monthly payments effective March 1, 2018 through June 1, 2018, on the account in the amount of $7,294.44 on February 12, 2019. However, as your client requested a refund, these funds were placed in miscellaneous suspense to be sent to her. Due to the above error, the account was incorrectly referred to foreclosure on October 9, 2018 . . . . Due to the

**CLASS ACTION COMPLAINT**

erroneous foreclosure referral, we covered the foreclosure fees of $2,293.49. These funds were placed in miscellaneous suspense on March 25, 2019. The total refund amount would have been $9,587.93; however we show the last payments on the account your client made were on February 3, 2019 . . . April 4, 2019 . . . and May 19, 2019 . . . . Funds from the refund amount were used to cover the May 2019 and June 2019 monthly payments of $1,823.61 each, for a total of $3,647.22. . . . Your client should receive the refund [of $6,129.71] within the next 3 to 5 business days . . . . As this matter has been resolved, I have put in a request to suppress your client's credit for the months of June 2018 through January 2019.

. . .

Additionally, we have confirmed that we received your correspondence dated March 26, 2019, and failed to respond to your correspondence. However, this letter serves as an error to the correction.

**Exhibit 15** pp. 1–2.

115.   In reviewing **Exhibit 15** against other correspondence sent by Ms. Tipich, through her counsel, it appears **Exhibit 15** was also an attempt to respond to

35

two other Notices of Error sent by Ms. Tipich on April 27, 2019 ("NOE #3") and

May 21, 2019 ("NOE #4").

### E.    Notice of Error #5 and Other Errors

116.    On June 19, 2019, Ms. Tipich, through her counsel, sent to Mr. Cooper

a Notice of Error ("NOE #5"), pursuant to 12 C.F.R. § 1024.35, by certified mail to

the address designated by Mr. Cooper on its website for the receipt of Notice of Error

letters, that address being: P.O. Box 10335, Des Moines, IA 50306-0335.  A copy of

NOE #5 is attached as *Exhibit 16*.

117.    NOE #5 related to the servicing of Ms. Tipich's mortgage loan and Mr.

Cooper's failure to complete the corrections noted in *Exhibit 15* as well as NOE #2,

NOE #3, and NOE #4. *See Exhibit 16* generally.

118.    NOE #5 was delivered to Mr. Cooper on June 20, 2019. *See Exhibit 16*

at p. 38.

119.    In addition to the errors related to NOE #2, NOE #3 and NOE #4 not

being addressed in *Exhibit 15*, NOE #5 also noted that *Exhibit 15* was inconsistent

with a May 2, 2019 letter Mr. Cooper had sent to Ms. Tipich which informed her that

"[w]e are writing to notify you that your account is currently paid ahead. As of the

date of this letter, your next payment is due 7/1/2019." *See Exhibit 16* at p. 3; *see

also Exhibit 16* at pp. 33–34 (May 2, 2019 letter).

120.    The May 2, 2019 letter was followed by a Monthly Mortgage Statement sent to Ms. Tipich on May 10, 2019 informing her that her next payment was due as of May 10, 2019. *Id.* at pp. 29–31.

121.    In reliance on the May 2, 2019 letter and the May 10, 2019 Statement, Ms. Tipich reasonably relied upon the statements of Nationstar and did not, as instructed by these correspondences, send in a monthly mortgage payment for June 2019.

122.    Prior to sending ***Exhibit 15***, Mr. Cooper sent a letter to Ms. Tipich dated June 6, 2019, which is attached as ***Exhibit 17***. The June 6, 2019 letter informed Ms. Tipich that:

> Recently a transaction on your account has resulted in us placing funds in an unapplied funds account. This unapplied funds account is used for placing funds that are insufficient to be applied as a full payment. These funds can still be used toward future payments; however, while the funds are in an unapplied funds account, they may not prevent your account from accruing late fees or being reported as delinquent to credit bureaus where permitted under applicable law. Your current balance of unapplied funds is $7,953.32. To expedite the processing of these funds, please remit the remaining amount due in order to

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

complete a full payment owed. If additional funds are not

remitted and we are unable to apply these funds to your

loan, they may be subject to return.

As of the date of this letter, the total amount required to

bring this account current is ($4,244.55).

*See **Exhibit 17**.*

123.   Ms. Tipich was beyond frustrated, confused, and upset when she received the June 6, 2019 letter because (a) she had paid all payments timely; (b) Mr. Cooper was indicating these payments were not being credited to her account; (c) Mr. Cooper was informing her in writing that Mr. Cooper may be placing late fees on her account despite the fact she was current; (d) Mr. Cooper was informing her in writing that Mr. Cooper would be placing derogatory information on her credit report despite the fact that she was current; and (e) Mr. Cooper owed her money.

124.   On June 11, 2019, Mr. Cooper sent Ms. Tipich a check in the amount of $6,129.71, which was consistent with ***Exhibit 17***.

125.   Inexplicably, after receiving ***Exhibit 17*** and the refunds from Mr. Cooper on July 2, 2019, Ms. Tipich received a mortgage statement which indicated that on June 24, 2019, an additional principal payment was made as well as lender paid expenses of $384.00. *See **Exhibit 18**.*

126.   Upon receipt of this confusing statement, Ms. Tipich called Mr. Cooper on or about July 5, 2019, and was informed by a "Mr. Denardo" that (1) her account

**CLASS ACTION COMPLAINT**

was due for the September 1, 2019 mortgage payment, and (2) the $384.00 was a legal fee.

**F.      Notice of Error #6**

127.   Given the issues detailed above and the refund check, Ms. Tipich was anxious, confused, and once again worried about potentially skipping a payment based on the advice of Mr. Cooper.

128.   On August 8, 2019, Ms. Tipich, through her counsel, sent to Mr. Cooper a Notice of Error ("NOE #6"), pursuant to 12 C.F.R. § 1024.35, by certified mail to the address designated by Mr. Cooper on its website for the receipt of Notice of Error letters, that address being: P.O. Box 10335, Des Moines, IA 50306-0335.  A copy of NOE #6 is attached as ***Exhibit 19***.

129.   NOE #6 related to the servicing of Ms. Tipich's mortgage loan specifically related to the July 2, 2019 Mortgage Statement and the July 5, 2019 telephone call. *See **Exhibit 19*** generally.

130.   NOE #6 was received by Mr. Cooper on August 13, 2019. *See **Exhibit 20*** - USPS Tracking info.

131.   To date, neither Ms. Tipich nor her Counsel have received a response to NOE #6 from Mr. Cooper.

**G.      Notice of Error #7**

132.   On November 7, 2019, Ms. Tipich, through her counsel, sent to Mr. Cooper a Notice of Error ("NOE #7"), pursuant to 12 C.F.R. § 1024.35, by certified

mail to the address designated by Mr. Cooper on its website for the receipt of Notice of Error letters, that address being: P.O. Box 10335, Des Moines, IA 50306-0335.  A copy of NOE #7 is attached as *Exhibit 21.*

133.    NOE #7 related to the servicing of Ms. Tipich's mortgage loan specifically related to responses in letters sent by Mr. Cooper dated August 30, 2019, which purport to be responses to a June 26, 2019 letter which neither Ms. Tipich nor her counsel ever sent. *See Exhibit 21* at pp. 1–4.

134.    NOE #7 was received by Mr. Cooper on November 13, 2019. *See Exhibit 22* - USPS Tracking info.

135.    To date, neither Ms. Tipich nor her counsel has received a substantive response to NOE #7.

## IX. IMPACT OF DAMAGE UPON MS.TIPICH

136.    All of this time since her Chapter 13 discharge, all Ms. Tipich has ever wanted to do is have Mr. Cooper correctly apply her timely payments.

137.    Based on the allegations, *supra*, what has followed since her discharge is a repeated pattern of Mr. Cooper (1) *admittedly* misapplying her payments; (2) *admittedly* filing an improper foreclosure; (3) providing factually incorrect information as to the due date of her loan; and (4) failing to either properly respond to or respond at all to at least five Notices of Error in which Ms. Tipich provided Mr. Cooper with specific information to investigate and correct these errors.

138.   Mr. Cooper's actions, described above, have caused Ms. Tipich to suffer actual economic damages, including but not limited to: (1) the misapplication of at least $2,000.00 in tendered mortgage payments since February 1, 2019 to the present; and (2) the payment of attorney's fees and costs related to the preparation and sending of NOE #2, NOE #5, NOE #6, and NOE #7.

139.   In addition, Ms. Tipich has suffered damages in an amount yet to be determined related to: (1) her TMJ syndrome and treatment, which was proximately caused by the stress of Mr. Cooper's wrongful foreclosure and exacerbated by the actions of Mr. Cooper; (2) the continued emotional distress from the misapplication of payments which has resulted in a loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress; and (3) the continued emotional distress driven by the fear that despite being current on her loan, Mr. Cooper will file another wrongful Notice of Default.

## X. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of 12 C.F.R. § 1024.36(d)

### (Failure to timely respond to RFI #1)

140.   Ms. Tipich re-alleges paragraphs 1–139 as if fully set forth herein.

141.   12 C.F.R. § 1024.36(a) provides that "[a] servicer shall comply with the requirements of this section for any written request for information from a borrower that includes the name of the borrower, information that enables the servicer to

identify the borrower's mortgage loan account, and states the information the borrower is requesting with respect to the borrower's mortgage loan."

142.   Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. § 1024.36(a) provides that "[a]n information request is submitted by a borrower if the information request is submitted by an agent of borrower."

143.   12 C.F.R. § 1024.36(d)(1) provides that a servicer must respond to a request for information by either "[p]roviding the borrower with the requested information and contact information, including a telephone number, for further assistance in writing" or "[c]onducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance."

144.   12 C.F.R. § 1024.36(c) provides that: "Within five days (excluding legal public holidays, Saturdays, and Sundays) of a servicer receiving an information request from a borrower, the servicer shall provide to the borrower a written response acknowledging receipt of the information request.

145.   Furthermore, 12 C.F.R. § 1024.36(d)(2)(i) provides that:

A servicer must comply with the requirements of paragraph (d)(1) of this section:

(A) Not later than 10 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives an information request for the identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan; and

(B) For all other requests for information, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the information request.

146.    Based on the allegations above, RFI #1 sent on December 10, 2019 constituted a request for information pursuant to 12 C.F.R. § 1024.36(d)(2)(i)(B).

147.    RFI #1 was related to Mr. Cooper's servicing of Ms. Tipich's loan, as information regarding loss mitigation is within the definition of servicing as defined by RESPA.    *See **Exhibit 13**; see* 12 U.S.C. § 2605 generally; *see also Catalan v. GMAC Mortg. Corp*, 629 F.3d 676 (7th Cir. 2011); *McClain v. CitiMortgage, Inc.*, No. 15- C 6944, 2016 WL 269568 (N.D. Ill. Jan. 21, 2016); *Yepez v. Specialized Loan Servicing, LLC*, No. 18-cv-07422, 2019 WL 2644255 (N.D. Ill. June 27, 2019).

148.    RFI #1 was delivered to the address designated by Mr. Cooper to receive requests for information on December 17, 2018.

149.    Mr. Cooper acknowledged receipt of RFI #1 on December 18, 2018.

150.    Mr. Cooper sent a subsequent letter on January 2, 2019 indicating that it would provide a response to RFI #1 by January 16, 2019.

151.    Pursuant to 12 C.F.R. § 1024.36(d)(2)(i), Mr. Cooper was required to respond and provide the information requested within thirty (30) business days of receipt on December 18, 2018—*i.e.*, by Monday, February 4, 2019.

152.    Based on the allegations herein, Mr. Cooper did not provide a response to RFI #1.

153.    Mr. Cooper's actions in failing to provide a written response to RFI #1 within thirty (30) days, in compliance with the requirements of 12 C.F.R. § 1024.36(d)(2)(i), constitutes a willful violation of 12 C.F.R. § 1024.36(d)(2)(i).

154.    Mr. Cooper's actions are a pattern and practice of behavior in conscious disregard of Ms. Tipich's rights.

155.    As a result of Mr. Cooper's actions, Mr. Cooper is liable to Ms. Tipich for actual damages, as described, *supra*, as well as for statutory damages for each violation of RESPA based on Defendant's pattern and practice of noncompliance with its requirements, costs, and attorneys' fees related to the prosecution of this action.

///

///

///

///

**CLASS ACTION COMPLAINT**

## SECOND CAUSE OF ACTION

## Violation of 12 C.F.R. § 1024.35(e)

## (Failure to Properly Respond to NOE #1)

156. Ms. Tipich re-alleges paragraphs 1 through 139 as if fully restated herein.

157. 12 C.F.R. § 1024.35(a) provides "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

158. Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. § 1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower."

159. A servicer must respond to a notice of error by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its

determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance." 12 C.F.R. § 1024.35(e)(1).

160.  It is an error under 12 C.F.R. § 1024.35 for a servicer to commit any error in the servicing of a borrower's mortgage loan not specifically identified otherwise in 12 C.F.R. § 1024.35. 12 C.F.R. § 1024.35(b)(11).

161.  NOE #1 was sent to Mr. Cooper at its designated address for receipt of Notices of Error on December 17, 2018.

162.  Mr. Cooper acknowledged receipt of NOE #1 on December 26, 2018, and indicated its response would be provided by January 23, 2019.

163.  NOE #1 related to the servicing of Ms. Tipich's mortgage loan and servicing errors Mr. Cooper had committed included by not limited to:

    a.  Asserted errors for violations of 12 C.F.R. § 1024.35(b)(3) for the misapplication of payments consistent with the Loan Modification;

    b.  Asserted errors for violations of 12 C.F.R. § 1024.35(b)(9) for the filing of the Notice of Default;

    c.  Asserted errors for violations of 12 C.F.R. § 1024.35(b)(1) for the return of multiple payments tendered by Ms. Tipich;

    d.  Asserted errors for violations of 12 C.F.R. § 1024.35(b)(5) for the imposition of improper late fees.

*See Exhibit 11* at pp. 1–7.

164. Mr. Cooper provided Ms. Tipich with a response to NOE #1 with *Exhibit 12*.

165. Based on *Exhibit 12*, Mr. Cooper could not have adequately investigated any of the asserted errors in *Exhibit 11*. In fact, *Exhibit 12* admits Mr. Cooper improperly filed the Notice of Default. *See Exhibit 12* at pp. 1–4.

166. Mr. Cooper's actions in failing to conduct a reasonable investigation into all errors asserted in *Exhibit 11* constitutes a clear and distinct violation of 12 C.F.R. §1024.35(e).

167. Mr. Cooper's actions are believed to be a pattern and practice of behavior in conscious disregard of Ms. Tipich's rights.

168. As a result of Mr. Cooper's actions, Mr. Cooper is liable to Ms. Tipich for actual damages, as described, *supra*, as well as for statutory damages for each violation of RESPA based on Defendant's pattern and practice of noncompliance with the requirements of this section, costs, and attorneys' fees related to the prosecution of this action.

///

///

///

///

1

## **THIRD CAUSE OF ACTION**

## **Violation of 12 C.F.R. § 1024.35(e)(1)**

## **(Failure to Properly Respond to NOE #2)**

169.   Ms. Tipich re-alleges paragraphs 1 through 139 as if fully restated herein.

170.   12 C.F.R. § 1024.35(a) provides "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

171.   12 C.F.R. § 1024.35(d) provides that a servicer must acknowledge in writing receiving a notice of error from a borrower within five days of receipt.

172.   12 C.F.R § 1024.35(a) provides "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

173.   Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. § 1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower."

174.   12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to a notice of error by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance."

175.   12 C.F.R. § 1024.35(e)(3)(i) provides that "a servicer must comply with the requirements of paragraph (e)(1)…not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the applicable notice of error."

176.   12 C.F.R. § 1024.35(b)(11) provides that it is an error under 12 C.F.R. § 1024.35 for a servicer to commit any error in the servicing of a borrower's mortgage loan not specifically identified otherwise in 12 C.F.R. § 1024.35.

177.   NOE #2 sent to Mr. Cooper on March 26, 2019 was a Notice of Error letter pursuant to 12 C.F.R. § 1024.35.

178.   NOE #2 was delivered to Mr. Cooper on or about March 30, 2019.

**CLASS ACTION COMPLAINT**

179.   In a letter dated April 11, 2019, Mr. Cooper stated it received NOE #2 on April 9, 2019 and would provide a response by May 20, 2019.

180.   NOE #2 related to the servicing of Ms. Tipich's mortgage loan and servicing errors Mr. Cooper had committed included by not limited to the asserted errors for violations of 12 C.F.R. § 1024.35(b)(11) for failing to conduct a reasonable investigation as to the issues noted in NOE #1, as each of the asserted errors in NOE #1 still existed.

181.   Despite its pledge to respond by May 20, 2019, Mr. Cooper responded to NOE #2 on June 11, 2019. *See Exhibit 15*.

182.   In *Exhibit 15*, Mr. Cooper provides responses to NOE #2 such as:

a.  "We show an error occurred with the payment ledger at the time of the Motion for Relief, as we did not claim the four additional payments. As a correction to this error, what have put in a request to advance four monthly payments effective March 1, 2018 through June 1, 2018, on the account in the amount of $7,294.44 on February12, 2019. However, as your client requested a refund, these funds were placed in miscellaneous suspense to be sent to her. Due to the above error, the account was incorrectly referred to foreclosure on October 9, 2018 . . . " *Exhibit 15* at p. 1.

b.  "Due to the erroneous foreclosure referral, we covered the foreclosure fees of $2,293.49. These funds were placed in

**CLASS ACTION COMPLAINT**

miscellaneous suspense on March 25, 2019. The total refund amount would have been $9,587.93; however we show the last payments on the account your client made were on February 3, 2019 . . . April 4, 2019 . . . and May 19, 2019. Funds from the refund amount were used to cover the May 2019 and June 2019 monthly payments of $1,823.61 each, for a total of $3,647.22." *Id*.

c.  "Your client should receive the refund [of $6,129.71] within the next 3 to 5 business days." *Id*. at p. 2.

d.  "As this matter has been resolved, I have put in a request to suppress your client's credit for the months of June 2018 through January 2019." *Id*.

e.  "Additionally, we have confirmed that we received your correspondence dated March 26, 2019, and failed to respond to your correspondence. However, this letter serves as an error to the correction." *Id*.

183.    In *Exhibit 15*, Mr. Cooper admits that it committed multiple violations of RESPA including (1) failing to properly respond to NOE #1 in violation of 12 C.F.R. § 1024.35(e), and (2) misapplying Ms. Tipich's payments in violation of 12 C.F.R. § 1024.35(b)(2), 12 C.F.R. § 1024.35(b)(5) and 12 C.F.R. § 1024.35(b)(11). *Id*.

184.   Mr. Cooper's actions in failing to conduct a reasonable investigation into all errors asserted in **Exhibit 14** constitutes a clear and distinct violation of 12 C.F.R. § 1024.35(e).

185.   Mr. Cooper's actions are believed to be a pattern and practice of behavior in conscious disregard for Ms. Tipich's rights.

186.   As a result of Mr. Cooper's actions, Mr. Cooper is liable to Ms. Tipich for actual damages, as described, *supra*, as well as for statutory damages per each violation of RESPA based on Defendant's pattern and practice of noncompliance with the requirements of this section, costs, and attorneys' fees related to the prosecution of this action.

## FOURTH CAUSE OF ACTION

### Violation of 12 C.F.R. § 1024.35(e)

### (Failure to Properly Respond to NOE #5)

187.   Ms. Tipich re-alleges paragraphs 1 through 139 as if fully restated herein.

188.   12 C.F.R. § 1024.35(a) provides "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

189.   12 C.F.R. § 1024.35(d) provides that a servicer must acknowledge in writing receiving a notice of error from a borrower within five days of receipt.

190.   12 C.F.R. § 1024.35(a) provides "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

191.   Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. § 1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower."

192.   12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to a notice of error by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance."

**CLASS ACTION COMPLAINT**

193.   12 C.F.R. § 1024.35(e)(3)(i) provides that "a servicer must comply with the requirements of paragraph (e)(1)…not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the applicable notice of error."

194.   12 C.F.R. § 1024.35(b)(11) provides that it is an error under 12 C.F.R. § 1024.35 for a servicer to commit any error in the servicing of a borrower's mortgage loan not specifically identified otherwise in 12 C.F.R. § 1024.35.

195.   NOE #5 (sent to Mr. Cooper on June 19, 2019) was a Notice of Error letter pursuant to 12 C.F.R. § 1024.35.

196.   NOE #5 was delivered to Mr. Cooper on or about June 20, 2019.

197.   NOE #5 related to the servicing of Ms. Tipich's mortgage loan and servicing errors Mr. Cooper had committed included by not limited to:

    a.   The asserted errors in NOE #2, NOE #3, and NOE #4;

    b.   The asserted errors in response to reviewing the investigation referenced in *Exhibit 15* to the statements contained in the May 2, 2019 letter advising Ms. Tipich that her account was due for July 1, 2019. *See Exhibit 16* at p. 3; *see also Exhibit 16* at pp. 33–34.

198.   To date neither Ms. Tipich nor her counsel have received a substantive response to NOE #5.

199.   Mr. Cooper's actions in failing to conduct a reasonable investigation into all errors asserted in ***Exhibit 16*** constitute a clear and distinct violation of 12 C.F.R. § 1024.35(e).

200.   Mr. Cooper's actions are a pattern and practice of behavior in conscious disregard for Ms. Tipich's rights.

201.   As a result of Mr. Cooper's actions, Mr. Cooper is liable to Ms. Tipich for actual damages, as described, *supra*, as well as for statutory damages per each violation of RESPA based on each Defendant's pattern and practice of noncompliance with the requirements of this section, costs, and attorneys' fees related to the prosecution of this action.

## FIFTH CAUSE OF ACTION

### Violation of 12 C.F.R. § 1024.35(e)(1)

### (Failure to Properly Respond to NOE #6)

202.   Ms. Tipich re-alleges paragraphs 1 through 139 as if fully restated herein.

203.   12 C.F.R. § 1024.35(a) provides "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

**CLASS ACTION COMPLAINT**

204.   12 C.F.R. § 1024.35(d) provides that a servicer must acknowledge in writing receiving a notice of error from a borrower within five days of receipt.

205.   12 C.F.R. § 1024.35(a) provides "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

206.   Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. § 1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower."

207.   12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to a notice of error by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance."

**CLASS ACTION COMPLAINT**

208.   12 C.F.R. § 1024.35(e)(3)(i) provides that "a servicer must comply with the requirements of paragraph (e)(1)…not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the applicable notice of error."

209.   12 C.F.R. § 1024.35(b)(11) provides that it is an error under 12 C.F.R. § 1024.35 for a servicer to commit any error in the servicing of a borrower's mortgage loan not specifically identified otherwise in 12 C.F.R. § 1024.35.

210.   NOE #6 (sent to Mr. Cooper on August 8, 2019) was a Notice of Error letter pursuant to 12 C.F.R. § 1024.35.

211.   NOE #6 was delivered to Mr. Cooper on or about August 13, 2019. *See Exhibit 20*.

212.   NOE #6 related to the servicing of Ms. Tipich's mortgage loan and servicing errors Mr. Cooper had committed included but not limited to the errors related to the erroneous charges on the July 2, 2019 mortgage statement, including the $345.00 corporate advance and the July 5, 2019 telephone call in which an agent of Mr. Cooper again advised Ms. Tipich her mortgage was paid ahead by a month. *See Exhibit 19* generally.

213.   To date neither Ms. Tipich nor her counsel have received a substantive response to NOE #6.

214.    Mr. Cooper's actions in failing to conduct a reasonable investigation into all errors asserted in *Exhibit 19* constitutes a clear and distinct violation of 12 C.F.R. § 1024.35(e).

215.    Mr. Cooper's actions are a pattern and practice of behavior in conscious disregard for Ms. Tipich's rights.

216.    As a result of Mr. Cooper's actions, Mr. Cooper is liable to Ms. Tipich for actual damages, as described, *supra*, as well as for statutory damages per each violation of RESPA based on Defendant's pattern and practice of noncompliance with the requirements of this section, costs, and attorneys' fees related to the prosecution of this action.

## SIXTH CAUSE OF ACTION

### Violation of 12 C.F.R. § 1024.35(e)(1)

### (Failure to Properly Respond to NOE #7)

217.    Ms. Tipich re-alleges paragraphs 1 through 139 as if fully restated herein.

218.    12 C.F.R. § 1024.35(a) provides "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

219.   12 C.F.R. § 1024.35(d) provides that a servicer must acknowledge in writing receiving a notice of error from a borrower within five days of receipt.

220.   12 C.F.R. § 1024.35(a) provides "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

221.   Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. § 1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower."

222.   12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to a notice of error by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance."

**CLASS ACTION COMPLAINT**

223.   12 C.F.R. § 1024.35(e)(3)(i) provides that "a servicer must comply with the requirements of paragraph (e)(1)…not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the applicable notice of error."

224.   12 C.F.R. § 1024.35(b)(11) provides that it is an error under 12 C.F.R. § 1024.35 for a servicer to commit any error in the servicing of a borrower's mortgage loan not specifically identified otherwise in 12 C.F.R. § 1024.35.

225.   NOE #7 (sent to Mr. Cooper on November 7, 2019) was a Notice of Error letter pursuant to 12 C.F.R. § 1024.35.

226.   NOE #7 was delivered to Mr. Cooper on or about November 13, 2019. *See Exhibit 22*.

227.   NOE #7 related to the servicing of Ms. Tipich's mortgage loan specifically related to responses in letters sent by Mr. Cooper dated August 30, 2019 which purport to be responses to a June 26, 2019 letter which neither Ms. Tipich nor her counsel ever sent. *See Exhibit 21* at pp. 1–4.

228.   To date neither Ms. Tipich nor her counsel have received a substantive response to NOE #7.

229.   Mr. Cooper's actions in failing to conduct a reasonable investigation into all errors asserted in *Exhibit 21* constitutes a clear and distinct violation of 12 C.F.R. § 1024.35(e).

230. Mr. Cooper's actions are believed to be a pattern and practice of behavior in conscious disregard for Ms. Tipich's rights.

231. As a result of Mr. Cooper's actions, Mr. Cooper is liable to Ms. Tipich for actual damages, as described, *supra*, as well as for statutory damages per each violation of RESPA based on Defendant's pattern and practice of noncompliance with the requirements of this section, costs, and attorneys' fees related to the prosecution of this action.

## SEVENTH CAUSE OF ACTION

### Negligence

### California Civil Code § 1714

232. Ms. Tipich re-alleges paragraphs 1 through 139 as if fully set forth herein.

233. Mr. Cooper owed a duty of care under California Civil Code § 1714 to Ms. Tipich in the ordinary course of the servicing of her mortgage, which included the proper application of her payments and all correspondence sent to Ms. Tipich.

234. Based on the allegations above, Mr. Cooper committed multiple acts in breaching its duty of care, including but not limited to:

a. Improperly filing the Notice of Default;

b. Failing to respond adequately to RFI #1, NOE #1, NOE #2, NOE #5, NOE #6, and NOE #7;

c.  Improperly applying all tendered mortgage payments for all times relevant to this Complaint as demonstrated by Mr. Cooper's various admissions;

d.  Improperly imposing corporate advance fees of $345.00 without justification; and

e.  Advising Ms. Tipich on at least two (2) occasions in writing and/or verbally to miss a monthly mortgage payment at a time when Mr. Cooper knew or reasonably should have known that missing those payments would cause the loan to become delinquent.

235.   As a direct and proximate result of Mr. Cooper's negligence herein, Mr. Cooper has caused damage to Ms. Tipich, including but not limited to (1) the damages described in Paragraphs 136–139, and (2) continued severe emotional distress and anguish every single month as Mr. Cooper has failed to correct all of the errors on the loan described herein.

236.   Pursuant to California Civil Code Section 3333, Ms. Tipich is entitled to damages in the amount that will compensate for all the detriment proximately caused by Defendant. Since Defendant acted recklessly, with oppression, and/or malice, Ms. Tipich is entitled to punitive damages in an amount to be determined at trial, pursuant to California Civil Code section 3294.

///

///

CLASS ACTION COMPLAINT

## CLASS ALLEGATIONS FOR

## EIGHTH AND NINTH CAUSES OF ACTION

237.    **Class Definition**: Ms. Tipich brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a nationwide class of similarly situated individuals and entities ("the Class"), defined as follows:

> All persons who, within four (4) years prior to the filing of this action, received an unsolicited text message from Mr. Cooper where the text message was not made for emergency purposes, and not made with the express prior consent of the recipient.

> Excluded from the Class are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any persons who have had their claims in this matter finally adjudicated and/or

otherwise released; and (5) the legal representatives,

successors and assigns of any such excluded person.

238.  **Numerosity**: Upon information and belief, the Class is comprised of tens of thousands of Class members.  Thus, the Class is so numerous that joinder of all members is impracticable.  Class members can easily be identified through Defendant's records, or by other means.

239.  **Commonality and Predominance**: There are several questions of law and fact common to the claims of Plaintiff and Class members, which predominate over any individual issues, including:

a.  Whether, within the four years prior to the filing of this Complaint, Defendant or its agents sent any text messages (other than a message made for emergency purposes or made with the prior express consent of the called party) to a Class member using an ATDS to any telephone number assigned to a cellular phone service; and

b.  Whether Ms. Tipich and the Class members were damaged thereby, and the extent of damages for such violation.

240.  **Typicality:** Ms. Tipich's claims are typical of the claims of members of the Class.  All claims are based on the same legal and factual issues. Ms. Tipich received at least four text messages from Mr. Cooper and had not provided consent to Mr. Cooper to be contacted by text.

**CLASS ACTION COMPLAINT**

241.   **Adequacy of Representation**: Ms. Tipich will fairly and adequately represent and protect the interests of the members of the Class and has retained counsel competent and experienced in complex class actions. Ms. Tipich has no interest antagonistic to those of members of the Class, and Mr. Cooper has no defenses unique to Ms. Tipich. The questions of law and fact common to the proposed Class predominate over any questions affecting only individual members of the Class.

242.   **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for proposed members of the Class to prosecute their claims individually. The trial and the litigation of Plaintiff's claims are manageable.

## <u>EIGHTH CAUSE OF ACTION</u>

**Negligent Violations of the TCPA, 47 U.S.C. § 227, *et seq.***

**(On behalf of Ms. Tipich and the Class)**

243.   Ms. Tipich re-alleges paragraphs 1 through 139 and Paragraphs 237 through 242 of the Complaint as if fully restated herein.

244.   Based on the allegations above, Mr. Cooper and/or its agents violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls (including text messages) to the cellular telephone numbers of Plaintiff and members of the Class using an ATDS and/or artificial or prerecorded voice without prior express consent.

**CLASS ACTION COMPLAINT**

245.   The foregoing acts and omissions of Mr. Cooper, including any acts by and through its agents, constitute numerous and multiple negligent violations of the TCPA.

246.   As a result of Mr. Cooper's negligent violations of 47 U.S.C. § 227, Ms. Tipich and each member of the Class are entitled to an award of $500.00 in statutory damages, for each violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

247.   Ms. Tipich and the Class are also entitled to and seek injunctive relief prohibiting such conduct in the future.

## NINTH CAUSE OF ACTION

**Knowing and/or Willful Violations of the TCPA, 47 U.S.C. § 227, *et seq.***

**(On behalf of Ms. Tipich and the Class)**

248.   Ms. Tipich re-alleges paragraphs 1 through 139 and Paragraphs 237 through 242 of the Complaint as if fully restated herein.

249.   Based on the allegations above, Mr. Cooper and/or its agents knowingly and/or willfully violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls (including text messages) to the cellular telephone numbers of Ms. Tipich and members of the Class using an ATDS and/or artificial or prerecorded voice without prior express consent.

250.   The foregoing acts and omissions of Mr. Cooper constitute numerous and multiple knowing and/or willful violations of the TCPA.

**CLASS ACTION COMPLAINT**

251.   As a result of Defendant's knowing and/or willful violations of 47 U.S.C. § 227, Ms. Tipich and each member of the Class are entitled to an award of $1,500.00 in statutory damages for each violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Tipich, individually and on behalf of all others similarly situated, respectfully requests the entry of judgment against Mr. Cooper as follows:

A.    For judgment in favor of Ms. Tipich and against Mr. Cooper on all claims;

B.    For actual damages according to proof, but not less than $25,000.00 for the allegations contained in the First through Seventh Causes(s) of Action, as applicable;

C.    For $2,000.00 in statutory damages per violation under 12 U.S.C. § 2605(f), for violations of the RESPA and Regulation X as described in the First through Sixth Causes(s) of Action;

D.    For an award to Ms. Tipich for actual, compensatory and punitive damages for Mr. Cooper's negligence based on the allegations contained in the Seventh Cause of Action;

E.    For an award to Ms. Tipich for the costs of this action, including the fees and costs of experts, together with reasonable attorney's fees, costs

and expenses for the allegations contained in First through Seventh Causes(s) of Action;

F.  In the event of default, for an award of actual damages against Mr. Cooper jointly and severally, as applicable, in an amount of at least $100,000.00 for all of the allegations contained in First through Seventh Causes(s) of Action;

G.  For a finding that the Eighth and Ninth Causes of Action satisfy the prerequisites for maintenance as a class action, and certifying the Class;

H.  For an Order designating Ms. Tipich as a representative of the Class and her undersigned counsel as Class Counsel;

I.  For an Entry of Judgment in favor of Ms. Tipich and the Class and against Mr. Cooper for the Eighth and Ninth Causes of Action;

J.  For an award to Ms. Tipich and the Class for actual damages, statutory damages per violation, punitive damages and all other forms of available relief for Mr. Cooper's violations of the law set forth in the Eighth and Ninth Causes of Action;

K.  For an injunction enjoining Mr. Cooper from sending further unsolicited text messages;

L.  For an award of Class Counsel's attorney's fees and costs, including interest thereon, as allowed or required by law under the Eighth and Ninth Causes of Action; and

M.     For all other relief at law or in equity that Ms. Tipich and/or the Class, as applicable, are entitled to by law that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Ms. Tipich, individually and on behalf of all others similarly situated, respectfully requests a trial by jury as to each and every claim for which she is so entitled.

Dated: April 29, 2020          By: /s/ Tiffany N. Buda_____

John R. Habashy, State Bar No. 236708
john@lexiconlaw.com
Tiffany N. Buda, State Bar No. 232679
tiffany@lexiconlaw.com
**LEXICON LAW PC**
633 W. 5th Street, 28th Floor
Los Angeles, CA 90071
Telephone:    (213) 223-5900
Facsimile:    (888) 373-2107

Marc E. Dann (OH # 0039425)
*(Pro Hac Vice Admission Anticipated)*
notices@dannlaw.com
Brian D. Flick (OH # 0081605)
*(Pro Hac Vice Admission Anticipated)*
bflick@dannlaw.com
**DANNLAW**
PO Box 6031040
Cleveland, OH 44103
Telephone:  (513) 645-3488
Facsimile:   (216) 373-0536 e-fax

Thomas A. Zimmerman, Jr. (IL # 6231944)
*(Pro Hac Vice Admission Anticipated)*
tom@attorneyzim.com
**ZIMMERMAN LAW OFFICES, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020
Facsimile:  (312) 440-4180

**Attorneys for Plaintiff Sharon Tipich and the Putative Class**